Filed 5/26/21  P. v. Franco CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICKY CAMPOS FRANCO,<br><br>    Defendant and Appellant. | E073793<br><br>(Super.Ct.No. RIF1408130)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  David A. Gunn and F. Paul Dickerson III, Judges.  Affirmed in part; reversed in part with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Ricky Campos Franco guilty of three counts of attempted voluntary manslaughter (Pen. Code, §§ 664, 192, subd. (a).)[1] The jury found true the allegations that, during two of the attempted killings, (1) defendant personally and intentionally discharged a firearm resulting in great bodily injury (§ 12022.53, subd. (d)); and (2) defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)). The jury also found true the allegations that, during all three of the attempted killings, defendant personally used a firearm. (§ 12022.5, subd. (a).)

The jury found defendant not guilty of the greater charges of three counts of attempted murder. (§§ 664, 187, subd. (a).) The jury found untrue the allegations that (A) the three attempted killings were willful, deliberate, and premeditated (§ 189); (B) the three attempted killings were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)); (C) during one of the attempted killings, defendant personally and intentionally discharged a firearm resulting in great bodily injury (§ 12022.53, subd. (d)); and (D) during one of the attempted killings, defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The trial court found true the allegation that defendant had a previous conviction in Texas for aggravated robbery, which qualified as a prior strike conviction (§§ 667, subds (c) & (e)(1), 1170.12, subd. (c)(1)) and a prior serious felony conviction (§ 667, subd. (a)). The trial court sentenced defendant to prison for a term of 25 years, eight months.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant raises four issues on appeal. First, defendant contends the trial court erred by denying defendant's pretrial motion for the court to revoke his status as a self-represented litigant and appoint counsel. Second, defendant asserts the trial court erred by denying the same motion when it pertained to the bifurcated trial on the prior conviction allegations and the sentencing hearing. Third, defendant contends the enhancements for personally and intentionally discharging a firearm resulting in great bodily injury (§ 12022.53, subd. (d)) must be stricken. Fourth, defendant asserts the presentence incarceration fee (§ 1203.1c) must be stricken. We affirm in part and reverse in part with directions.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>DEFENDANT'S CRIMES</u>

1.     *THE PEOPLE'S CASE*

Roberto Franco (Brother) is defendant's half-brother. Brother is a member of the Eastside Wilmas street gang, located in Wilmington, California. Defendant has tattoos strongly indicative of membership in the Eastside Wilmas, such as "Wilmas" tattooed across his abdomen. Richard Franco (Nephew) is defendant's nephew and Brother's son. In April 2019, Nephew was 26 years old. Damien Nava (Nava) is Nephew's friend. Nava is a member of the Family Mob street gang, in Orange County.

On June 16, 2014, at approximately 11:30 p.m., Nephew and Nava (collectively, the sellers) went to a McDonald's to sell marijuana. The sale was arranged in advance for approximately $200, but the purchasers were people who the sellers did not know well. The purchasers were Demoundray Johnson (D.J.), and D.J.'s brother Dante

3

Johnson (collectively, the brothers).[2]  Nephew met D.J. on Facebook when D.J. sent

Nephew a message asking to buy marijuana from Nephew.  On Facebook, Nephew saw

that he and D.J. shared a mutual friend, Gilbert Moreno.  Nephew asked Moreno about

D.J.  Moreno said that he knew the brothers cousin, Reginald Hamilton, and that

"they're cool."

At the McDonald's, the brothers robbed the sellers at gunpoint.  The brothers

took the sellers' cell phones, Nephew's wallet, and the marijuana, which weighed one

ounce.  After the robbery, Nephew saw that Hamilton was selling the cell phones on

Facebook.  Nephew sent a message to Hamilton via Facebook stating that he wanted the

sellers' stolen property returned.  Hamilton agreed to leave the phones and Nephew's

identification at a mutual acquaintance's house for Nephew to pick-up.  Brother picked

up the property.  When Nephew again had his cell phone in his possession, he began

receiving death threats from Hamilton due to Hamilton's belief that Nephew had

disrespected Hamilton.

On June 18, 2014, Nephew went to see Brother, who was at the home of a

cousin, Ruben Franco.  Nephew told Brother about the death threats.  Nephew found

pictures of D.J. and D.J.'s Cadillac on Facebook and showed the pictures to Brother.

Nephew also told Brother the name of the street Hamilton lived on, which Nephew

learned through friends.  Brother instructed Nephew to go to Nephew's girlfriend's

---

[2]  In this opinion we use first names for people who share the same last name as other people involved in the case, in order to make the facts clearer.  No disrespect is intended.

4

trailer, pick up Nephew's baby and girlfriend (Girlfriend), and whatever he needed to leave because Brother planned to help Nephew flee due to the death threats. Brother had Richard Uribe, a family friend and fellow Eastside Wilmas street gang member, follow Nephew to the trailer park where Girlfriend lived to ensure no harm came to Nephew.

After Nephew and Uribe arrived at Girlfriend's trailer, others began gathering at the trailer including defendant, Brother, Ruben, and Nava. Hamilton called Nephew with another death threat while the group was at Girlfriend's home. Brother took the phone and argued with Hamilton, which resulted in Hamilton threatening Brother. After the phone call, someone said, "[L]et's go see where these fools are at." Nephew, his son, and Girlfriend went to Brother's house.

Defendant and Brother got into a Subaru, with Brother driving and defendant in the passenger seat. Nava and Uribe got into a Volkswagen SUV, with Uribe driving and Nava in the passenger seat. Brother drove to the street where he believed Hamilton lived and "just drove up and down the street." Uribe and Nava followed behind defendant and Brother.

Eventually, Brother saw D.J.'s gold Cadillac. There were three people inside the Cadillac: the brothers and Hamilton. The Subaru, with defendant and Brother inside, "pull[ed] up next to the Cadillac and then [defendant] fired" two or three shots. The Cadillac made a right turn, and the Subaru and Volkswagen followed. After more driving and turns, defendant fired more shots at the Cadillac. Brother crashed the Subaru into a light pole. The Volkswagen stopped next to the Subaru. Defendant

5

tossed a rifle into the Volkswagen, and defendant and Brother entered the Volkswagen. Uribe drove away from the crash site. One of the men inside the Volkswagen recognized the home of an acquaintance. Defendant and Nava exited the Volkswagen and went to the acquaintance's home. Shortly thereafter, Sheriff's deputies came to the acquaintance's home and arrested defendant. There were no bullet strikes or bullet holes on the Subaru.

Riverside County Sheriff's deputies found D.J.'s Cadillac approximately one-half mile away from the Subaru, stopped next to a sidewalk. D.J.'s Cadillac sustained at least 20 gunshots along the driver's side and rear end of the vehicle. During the shooting, D.J. suffered "gunshot wound[s] to the back of his head, back of his neck, and to his [l]eft thigh." D.J. was placed in an induced coma for a month. D.J. was then transferred by ambulance to a second hospital "because his brain was bleeding and it wouldn't stop," and then he was transferred to a rehabilitation hospital where he stayed for a couple of months relearning how to walk and speak. Nearly five years after the shooting, D.J.'s left side was paralyzed, he walked with a walker, and his speech was slurred. During the shooting, Dante was shot in his right thigh, left arm, and left hand. Nearly five years later, he was still unable to use his fingers. Hamilton suffered gunshot wounds on his right calf and left upper thigh. Hamilton stayed in the hospital for one day.

Sheriff's deputies found a semiautomatic handgun on the floorboard of the Cadillac, underneath the driver's seat. A revolver was found close to the Cadillac, "in the bushes near the sidewalk."

## 2. *DEFENDANT'S CASE*

Defendant testified at trial. Brother was at Ruben's house helping Ruben move when Nephew came to the house tell Brother about Hamilton's threats. Nephew looked scared. Brother told Nephew to go home, pack, and get the baby. Uribe left when Nephew left. Brother and defendant went to Girlfriend's trailer to help "get [Nephew] out [of] there."

At Nephew's house, defendant heard Brother arguing on the phone. After the phone call ended, Brother told defendant that the people who robbed Nephew were threatening to kill Nephew and were now threatening to kill Brother, and that they were planning to come to Girlfriend's home. Nava said, " 'That's them right there,' " and a Cadillac and Altima passed by. The Altima belonged to Hamilton's brother.

Brother, Ruben, and Uribe got into Uribe's Volkswagen with Uribe driving. Defendant sat down in the passenger seat of the Subaru. Defendant could not name the driver of the Subaru in court because, if he did, then he would be killed in jail, but he did say the driver of the Subaru was not Brother, Ruben, Uribe, or Nephew; Defendant could not say if Nava was the driver. Once defendant and the unidentified driver of the Subaru (the Driver) were inside the Subaru, the Driver placed a gun next to defendant. The Driver followed Nephew part of the way as Nephew drove to Brother's house. "All [defendant] wanted was a ride home"; and he believed that he was in the Subaru for a ride home. The Driver told defendant that, before the Driver drove defendant home, they would "turn back around and make sure they are not by" Nephew's girlfriend's

7

home.  After driving by Nephew's girlfriend's home, the Driver began driving defendant home.

As the Driver drove "he said, 'That's them.' "  Defendant saw the Cadillac and the Altima.  The Driver grabbed the gun and fired.  Defendant saw a person in the Cadillac or Altima also pointing a firearm and he heard two shots that he believed came from the Cadillac or Altima.  The Driver drove away, but the Cadillac and Altima followed.  After various turns down different streets, defendant was in a position to see the backseat passenger in the Cadillac pass a firearm to the front seat passenger.  After more turns, the Subaru was behind the Cadillac.  The Cadillac slowed, and the Subaru passed alongside of it.  The Cadillac driver rolled down his window and pointed a gun at the Subaru.  Defendant pointed the gun at the Cadillac and began firing.  Defendant was aiming for the driver of the Cadillac but shot the entirety of the Cadillac because the vehicles were moving.  "[Defendant] shot and [he] kept firing [because he] had guns pointed at [him]."  Defendant "was trying to protect [his] own life."  Then the Subaru crashed.

Defendant was born in 1984.  Defendant was a member of the Eastside Wilmas when he was younger but, by 2014, he no longer considered himself a member of the gang.  Defendant did not "throw up a gang sign" during the shooting and neither did the victims.  Defendant did not speak to the victims on the telephone and never asked the victims where they were from.  The shooting "ha[d] nothing to do with gangs"; "[i]t just ha[d] to do with family."

8

B.    PROCEDURAL HISTORY

On June 23, 2014, the original complaint charging defendant and Brother was filed in the case.  The Public Defender was appointed to represent defendant.  At the arraignment, defendant was represented by deputy public defender Emma Smith.  On June 25, 2014, an amended complaint was filed.  On July 7, the Public Defender declared a conflict of interest.  The trial court relieved the Public Defender and appointed Greg Comings of the Law Offices of Gregory H. Comings to represent defendant.[3]  Defendant was arraigned on July 18, 2014, and he was represented by Mr. Comings.  Mr. Comings represented defendant at the preliminary hearing on July 14, 28, and 29, 2015.

On November 17, 2016, the trial court granted a motion for defendant to change counsel to Parwana Anwar, a private attorney.  On March 29, 2017, Ms. Anwar filed a written motion to continue the April 4, 2017 trial date.  Ms. Anwar asserted a continuance was needed because (1) the discovery in the case was lengthy, (2) the prosecutor assigned to the case recently changed, and (3) Ms. Anwar and the new prosecutor needed time to discuss a pretrial resolution of the case.  The trial court granted the motion and continued the trial to June 13, 2017.

---

[3] The July 7, 2014 minute order reads, "VMB attorneys appointed.  [¶] Defendant represented by Greg Comings."  We infer "VMB attorneys" is short for Virginia M. Blumenthal Law Offices, which is on the conflicts panel.  We also infer that, in the minute order, the clerk erred in entering "VMB attorneys" because the preliminary hearing transcript reflects Mr. Comings worked at the Law Offices of Gregory H. Comings.

On June 9, 2017, Ms. Anwar again moved the court to continue the trial date. Ms. Anwar asserted that (1) she and Brother's counsel were hoping to resolve the case prior to trial and were trying to have discussions with the prosecutor; and (2) the prosecutor had not yet provided gunshot residue (GSR) test results for defendant, Brother, and the three victims. The trial court granted the motion and continued the trial to September 6, 2017. On August 8, 2017, the trial court found that defendant was indigent. More continuances were granted in the second half of 2017.

In January 2018, Ms. Anwar applied for funds for GSR testing after learning the prosecution would not be conducting its own tests. On March 1, 2018, the trial court granted the request for funds. On March 5, 2018, a motion to continue trial was filed by Nicolas J. Estrada, as defendant's attorney. Mr. Estrada asserted the March 16, 2018, trial date needed to be continued due to defendant recently retaining Mr. Estrada. On March 13, 2018, Ms. Anwar filed a motion to continue the trial date. Ms. Anwar asserted the continuance was needed because (1) defendant was seeking to substitute in Mr. Estrada; and (2) the GSR testing process would take more time. On March 16, 2018, the trial court relieved Ms. Anwar as defendant's counsel, substituted in Mr. Estrada, and granted the motion for a continuance. The trial was set for September 11, 2018.

Defendant had two codefendants: Brother and Uribe. On July 6, in chambers, one of the parties requested a continuance of the trial date to September 19, 2018. On the record, Brother said he would not waive time past September 11. Defendant requested to be self-represented. The trial court, with Judge Helios Hernandez

10

presiding, said, "That's a real big decision. Do you really want to do that?" Defendant said he would use the law library to prepare his case and confirmed he wanted to be self-represented. The trial court warned, "It is never going to be as good and as easy as you think it is." The trial court noted that the case was 1,000 days old and estimated that the case would be delayed another 10 months if defendant switched to being self-represented. The court continued defendant's request so that Judge David A. Gunn could decide "whether or not he wants to let this trial get delayed." Brother's counsel said, "My client does object to any further delay. This case is almost four years old. I have been ready to try this case for a year and a half. [¶] . . . [¶] And I have only been on it for two years." The trial court set the trial date for Brother and Uribe for September 19, 2018.

On July 9, 2018, the trial court, with Judge David A. Gunn presiding, heard defendant's request to be self-represented. The trial court noted that defendant had been represented by two private attorneys (Ms. Anwar and Mr. Estrada), that the preliminary hearing was in 2015, and that trial was scheduled for September. The trial court said it did not intend to change the trial date, so it would grant defendant's request only if defendant could tell the court that he would be ready for trial in September. Defendant said, "I should be ready about that date, Your Honor." The trial court warned defendant that "it is a very foolish thing to represent yourself on these types of charges," that defendant would be "up against an experienced prosecutor," and that the court could not assist defendant "in any type of legal research." Defendant said he understood and that he wanted to represent himself. The prosecutor said, "[T]he case is so old it has already

11

had its fourth birthday."  The trial court again said it intended to keep the September trial date.  The trial court relieved Mr. Estrada and granted defendant's request to be self-represented.

The trial court explained that defendant would need to select an investigator from a list, then the court would appoint the investigator, and defendant would be given an initial allotment of investigator hours and any additional allotment would need to be granted by the court's funding panel after an application by defendant.  Defendant said he was familiar with the application process.

On August 17, 2018, the trial court held a trial readiness conference.  Defendant said he had made a formal discovery request but had not yet received discovery, and defendant had dismissed his investigator because the investigator refused to accept calls from the jail, so defendant wanted a different investigator appointed.  The court said it would appoint a different investigator for defendant.  The prosecutor said she told defendant that discovery had been provided to defendant's previous attorney and that defendant would need to obtain the discovery from the prior attorney.  The trial court made an order for Mr. Estrada to provide all of the discovery to defendant forthwith. Defendant asked the court for an order directing the jail to give defendant access to the telephone from 6:15 p.m. to 7:00 p.m. so that defendant could "contact any witnesses, investigator, anybody to help me in this defense."  Defendant explained that his telephone access was limited due to the overcrowding in the jail.  The court said defendant would need to provide more detail in a motion.

12

On September 7, 2018, defendant moved to continue the September 19 trial date. Defendant declared that he was not ready for trial because he had not yet received discovery. The trial court granted the motion and continued the trial to January 15, 2019.

On December 7, 2018, defendant moved to continue the trial. Defendant declared he had not yet "receive[d] [his] full discovery," so he was not ready for trial. Defendant's investigator declared that (1) she had received discovery from defendant's prior counsel on September 24, 2018; (2) that she had learned on November 13, 2018 that defendant would need to submit a new application for GSR test funding; (3) that on November 26, 2018, the investigator received approval of defendant's funding application for the investigator to make photocopies and purchase flash drives; and (4) on November 29, 2018, defendant's application for funding for GSR testing had been sent to the funding panel.

The investigator explained that she had already documented the discovery she had received; photocopied and redacted 274 pages, which contained 33 police reports; and photocopied and redacted 134 pages of transcripts. The investigator still needed to copy and redact approximately 450 pages of discovery; redact 11 audio interviews and videos and put them on flash drives; go through 34 folders on a flash drive received from counsel to redact and print or put on another flash drive; and receive approval of new applications to replenish the funds for photocopying. The trial court granted the motion and continued the trial to March 14, 2019.

13

On February 22, 2019, defendant filed another motion to continue the trial. Defendant said he was not ready for trial because he had "not reviewed all [the] evidence, still ha[d] not received [the] flash drive from [the] investigator[, and a]lso still need[ed] to test G.S.R. and get prepared." On March 12, 2019, the trial court, with Judge David A. Gunn presiding, held a hearing on defendant's motion. Brother's and Uribe's attorneys were present at the hearing. The trial court said defendant's motion failed to provide any specifics as to why defendant was still unprepared for trial. The court found that, in November, defendant's investigator declared that defendant had been provided with "most of the discovery at that time."

Defendant responded by requesting to be represented by counsel. Defendant explained, "I tried everything I could as far as this case. I can no longer proceed. I can't comprehend everything that's going on any further. I tried the best I could. I tried to get GSR funding. Both times I've been denied. [¶] To this day I still do not have a hundred percent discovery. There are videos I still—video surveillance I still haven't reviewed."

The trial court said defendant's request was untimely because trial was set to begin in two days. Defendant said, "I can't comprehend what's going on. I don't know what to do anymore." The trial court said that the case was more than four years old, that defendant was familiar with the case, that any discovery issues that remained were minor and could be cured in a few days, and that defendant was aware of the need for GSR funding in November 2018.

14

Brother's counsel explained that the GSR testing could help defendant because it could support a theory of self-defense. The trial court again noted that defendant had been aware of the need for funding for GSR testing since November 2018. The trial court said that if defendant's funding application had been denied, then the court would have to assume that defendant "is not going to get the GSR tested [because] he's had time to do that or to ask for a hearing before the pay panel."

Defendant again said, "I don't comprehend what's going on anymore. . . . I need counsel." The trial court noted that Brother and Uribe "had kept objecting to the continuances of these trials." Uribe's counsel said he would rather have an attorney representing defendant to avoid "the ills of a pro per [that] may splash over onto [his] client," therefore, Uribe did not object to a continuance. Brother's counsel said, "I'm still objecting." Brother's counsel explained that she filed a motion to sever because (1) she was pursuing a different defense, and (2) Brother "ha[d] been refusing to waive time since July."

The trial court said, "[I]t's just an untimely request at this point. I'm inclined to deny it." Defendant said he was unable to access the computer kiosk every day and that he did not have 100 percent of his discovery, such as various videos and GSR tests. Defendant said, "I don't know what I'm doing, Your Honor. I can't proceed any further than now." The court again noted that defendant had been part of the case for four years. Defendant said that for four years he "just prayed and hoped to get a good lawyer." The trial court responded, "You had good lawyers when you decided to represent yourself. Again, I don't know what lawyer I could give you that would

15

change that perception." Ms. Larson from the Public Defender's Office was at the hearing and said the office was available to be appointed, but Ms. Larson was not familiar with the case.

The trial court denied defendant's motion for a continuance, finding that defendant failed to demonstrate good cause. Due to the attorneys being involved in other trials, the trial court continued the trial from March 14 to March 18, 2020. There was not an explicit denial of defendant's request to withdraw his status as a self-represented litigant.

On March 18, the trial court, with Judge John D. Molloy presiding, heard the prosecutor's motion to trail the trial in order to serve a witness. The trial court granted the motion and trailed the trial to March 21. Defendant asked to withdraw his status as a self-represented litigant. Defendant said he lacked knowledge of the law, could not obtain funding for GSR testing, lacked videos that were part of the discovery, and did not "know what [he's] doing." The trial court scheduled defendant's motion for reconsideration for March 21 before Judge Gunn.

At the hearing on the motion for reconsideration, the trial court, with Judge Gunn presiding, said no documents had been filed with further information for the court. Defendant said he was "stressed out," "can't do the motions," and "need[s] help." The trial court said, "[Y]ou can't wait until the time of trial to request counsel. It's untimely." The trial court noted that the complaint was filed in 2014, and defendant waited until two days before trial to terminate his self-represented status. The trial court again said, "It's untimely."

16

Defendant said he still lacked video and audio recordings that were part of the discovery, so he did not "have all of the discovery even if [he] wanted to go to trial." The trial court noted that defendant knew of these discovery issues in November 2018 and could have asked for an attorney at that point and the trial court "probably would have honored [defendant's] request at that time, because we didn't have a trial date, or we[re] going to continue the trial date." The trial court concluded, "But, again, two days before trial isn't sufficient time. I have to conclude it's delay tactics, I mean, I really do." The trial court concluded, "I don't find good cause to appoint an attorney for [defendant] at this late date."

Later in the day on March 21, with Judge F. Paul Dickerson, III, presiding, the parties announced they were ready for trial with the exception of defendant. Defendant said, "I need counsel." Defendant explained that he was missing video recordings, needed transcriptions, and needed GSR tests. The trial court denied defendant's request to continue because Judge Gunn denied defendant's request for counsel.

The three defendants and the court agreed that Brother's and Uribe's attorneys would cross-examine witnesses before defendant in order to assist defendant in understanding the cross-examination process. Also, prior to trial, the trial court ruled that an objection by one defendant would be considered an objection by all three defendants, so as to preserve any issues for appeal. Uribe's attorney and Brother's attorney said they would work with defendant as they would work with any codefendant's counsel. Voir dire commenced on March 27, 2019. On April 3, 2019,

17

the jury was sworn, and the prosecution began presenting evidence. Uribe pled guilty on April 4, 2019.

Brother's attorney handled exhibits for defendant while defendant testified on direct examination, and she helped defendant with exhibits during recesses. Brother's attorney also raised objections to some of the prosecutor's questions during the cross-examination of defendant. For example, when the prosecutor asked, "What was [Uribe] doing behind the Cadillac?" Brother's attorney said, "Objection. Speculation."

## DISCUSSION

### A.    PRETRIAL REQUEST FOR COUNSEL

Defendant contends the trial court erred by denying his pretrial request for counsel, which resulted in defendant's constitutional right to counsel being violated.

A defendant's timely motion to be represented by counsel must be granted, but a trial court may exercise its discretion when presented with a defendant's untimely motion. (*People v. Lawrence* (2009) 46 Cal.4th 186, 192; see also *People v. Hill* (1983) 148 Cal.App.3d 744, 756 [a motion for self-representation made on the eve of trial is untimely].) In the body of defendant's appellate argument, he applies the law for an untimely motion. (*People v. Gallego* (1990) 52 Cal.3d 115, 164 ["factors a trial court should consider when faced with a midtrial request to change from counsel representation to self-representation"].) We infer from defendant's reliance on the law related to untimely motions that he concedes his motion was untimely and is asserting the trial court erred by not granting the untimely motion.

18

In exercising its discretion regarding an untimely motion to return to representation by counsel, the trial court must evaluate the totality of the circumstances surrounding the motion. (*People v. Lawley* (2002) 27 Cal.4th 102, 149; *People v. Hill*, *supra*, 148 Cal.App.3d at p. 756.) Factors for the court to consider include "(1) defendant's prior history in the substitution of counsel and the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney." (*People v. Gallego*, *supra*, 52 Cal.3d at p. 164.) We apply the abuse of discretion standard of review. (*People v. Lawley*, *supra*, 27 Cal.4th at p. 149.)

Defendant had four attorneys prior to becoming self-represented. Defendant had one attorney from the Public Defender's Office, one attorney from the conflicts panel, and two privately retained attorneys. At the hearing on defendant's request for counsel, defendant said, "In four years, Your Honor, I—I just prayed and hoped to get a good lawyer, you know." The trial court responded, "You had good lawyers when you decided to represent yourself. Again, I don't know what lawyer I could give you that would change that perception." Given that defendant had four lawyers, and the trial court believed the lawyers were "good lawyers," the trial court could reasonably conclude that returning defendant to counsel-represented status would likely not resolve defendant's concerns.

19

The second factor is the reasons for the request. At the hearing on defendant's request to once again be represented by counsel, defendant said he needed counsel because he could no longer "comprehend everything that's going on." Defendant explained that his efforts to represent himself had failed in that he failed to secure funding for GSR testing and failed to review the videos that were part of the discovery.

As to defendant's ability to understand the legal proceedings, the trial court said, "I'm sure that you're very familiar with the case. You're an intelligent person, from what I can tell here in court." The trial court also said, "I think [defendant] is capable of representing himself." The trial court's comments indicate the court rejected defendant's alleged lack of understanding because defendant was a smart person who understood the issues in the case. The trial court's comments are supported by the record, in that defendant filed two successful motions for continuances based upon his understanding of the case. The motions indicate that defendant understood the legal proceedings and the issues in the case.

As to the GSR testing, the trial court said, "I'm going to have to assume that if there is no funding for it, then [defendant] is not going to get the GSR tested." We note that the record indicates Ms. Anwar obtained funding for GSR testing on March 1, 2018. Brother's attorney explained that when defendant resubmitted his funding request as a self-represented litigant, "the first time it got denied, they misunderstood and thought he wanted funding to actually test people, roll people's fingerprints." Defendant said he tried to obtain GSR funding and "[b]oth times I've been denied." Defendant did not explain why his second request was denied, e.g., if it was due to a

lack of funding or another misunderstanding. The trial court concluded, "[H]e's had time . . . to ask for a hearing before the pay panel."

The trial court's comment reflects that the failure to secure GSR funding was not due to defendant's lack of counsel, rather, it was due to either a lack of available funding or defendant's failure to follow through with the process. Defendant failed to explain what an attorney would have done differently than him to secure funding. For example, defendant failed to explain what Ms. Anwar did to obtain funding that was different from defendant's applications for funding, and why defendant was unable to simply copy Ms. Anwar's application if the problem was due to a misunderstanding rather than a lack of funds. Given the lack of information in the record, the trial court could reasonably conclude that involvement of counsel would not have changed the issue of funding for GSR testing.

In regard to the videos, the trial court said, "[A]ny minor discovery that you still may need to go over can be accomplished in the next few days," and "[Y]ou'll have a few days to at least review the videos that you were mentioning." Defendant asserted that "[I]t takes time to get to the kiosk machine. I'm not able to get to the kiosk every day, Your Honor."[4] The trial court's comments indicate a conclusion that defendant would be able to watch the videos in the days prior to trial, and thus did not necessitate the appointment of counsel. The trial court's conclusion was reasonable, in that the

---

[4] We infer defendant was referring to the jail's law library computer kiosks.

attorneys for the other parties could show defendant the videos during the pretrial hearings if defendant was unable to watch them in the jail.

For example, the prosecutor said at the hearing on defendant's motion for reconsideration, "The surveillance video and the street cam, those were provided long ago. The investigator did ask me to reformat them, because they wouldn't play on whatever systems are available in the jail. And I did that weeks ago, and she picked them up. Those are things that he can see when we're in court. I can bring my computer and show him the videos as we're there. So those are things that we can cure if those are the actual issues.

The third factor is the length and stage of the proceedings. The trial court said, "This is a—to put it mildly, this is a four-year-old case. I think that's a conservative estimate. It's probably older than four years, certainly, when events took place." The trial court noted, "The trial is in two days." The record supports the trial court's timeline. The complaint was filed on June 23, 2014. Defendant made his request for counsel on March 12, 2019, and trial was scheduled for March 14, 2019. Thus, at the time defendant made his motion, trial was two days away and the case was over four and one-half years old.

The fourth factor is the disruption or delay which reasonably might be expected to ensue from the granting of such motion. Defendant did not specify in his motion if he wanted a newly retained private attorney, one of the two previously retained private attorneys, Mr. Comings from the conflicts panel, or a different attorney from the

conflicts panel.[5] Defendant did mention that for four years he "hoped to get a good lawyer," so we infer that defendant did not want any of his prior attorneys, who were familiar with the case. Thus, defendant wanted a new attorney who would need to become familiar with the case. The trial court noted that the case was not "necessarily a complex case, but, . . . there was a lot of discovery."

Defendant's investigator's report supports the trial court's remark, in that the investigator detailed some of the discovery as including 33 police reports, which totaled 274 pages; two sets of transcripts, which were 134 pages; 11 audio and video recordings; and a flash drive from counsel containing 34 folders of "audio, video, photos, multiple cellebrite records, [and] multiple interviews." Given the amount of discovery, if a new attorney were appointed or retained, there would necessarily be a delay in the trial because the attorney would need time to process the discovery.

Defendant contends the trial court erred by not asking Ms. Larson, the deputy public defender who said the Public Defender's Office was available for appointment, how long a delay the Public Defender's Office would need to prepare the case. The trial court checked if Ms. Larson was familiar with the case, and Ms. Larson said she was not familiar with the case. Given Ms. Larson's lack of familiarity with the case, it would not have been reasonable to ask her how long it would take a public defender to prepare the case. Moreover, the public defender declared a conflict in July 2014 and was relieved as defendant's counsel.

---

[5] On April 16, 2019, defendant renewed his motion for counsel in the midst of trial and requested "Virginia Blumenthal from the conflicts panel."

23

The fifth factor is the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney. Brother's attorney told the trial court that defendant had "a pretty good self-defense claim," which would involve the testimony of three prosecution witnesses—a civilian witness who saw one of the victims throw a firearm in the bushes, a law enforcement officer who recovered the firearm from the bushes, and a law enforcement officer who found a firearm in the Cadillac.

Defendant's defense was fairly simple in that it essentially involved asking witnesses about firearms in the Cadillac and the bushes. Defendant had successfully argued motions to continue the trial, and the trial court noted that defendant was intelligent. Given that defendant was capable of arguing motions, the trial court could reasonably conclude that defendant would likely be effective in asking witnesses about firearms in the Cadillac and the bushes.

Defendant asserts that he was unable to effectively defend himself because he "was inexplicably unable to obtain approval" of his application for funding for GSR testing when Ms. Anwar was able to obtain such funding. Brother's attorney told the trial court that, when defendant became self-represented, defendant was given a copy of Ms. Anwar's funding application and the pay panel's order granting the funding. Defendant's investigator declared that defendant successfully applied for funding for photocopying and flash drives. Thus, defendant (1) had a copy of a successful application for funding for GSR testing in his possession, and (2) knew how to file a successful funding application for photocopies and flash drives. Given the record, the

trial court could reasonably conclude that defendant did not need counsel to apply for funding for GSR testing.

In sum, (1) defendant had four attorneys prior to becoming self-represented; (2) defendant's reasons for wanting counsel did not demonstrate a need for counsel; (3) the case was over four years old, and defendant's motion was made two days before trial; (4) if defendant's motion were granted, then a delay in the proceedings would occur while counsel became familiar with the case; and (5) defendant was likely to be effective in defending himself. The trial court's denial of defendant's motion was within the bounds of reason; therefore, we conclude the trial court did not abuse its discretion. Consequently, we conclude defendant's constitutional right to counsel was not violated.

Defendant contends the trial court erred because "[t]he sole reason the court denied the request was because it came several days before trial in a case that had been pending for several years." Immediately after defendant made his oral motion, the trial court said, "The trial is in two days, [defendant]. Frankly, that request is untimely." Then, as it appeared the hearing was concluding, the trial court said, "And, again, it's just an untimely request at this point. I'm inclined to deny it." The trial court's comments cannot be read in isolation. When hearing defendant's motion, the trial court made comments that relate to all five of the factors, as detailed *ante*. Thus, the record shows that the trial court considered more than the timeliness of the motion when exercising its discretion.

25

B.     POSTVERDICT MOTION FOR COUNSEL

1.     *PROCEDURAL HISTORY*

Defendant made his initial pretrial motion for counsel on March 12, 2019. Defendant renewed that motion at nearly every court appearance thereafter. When defendant renewed the motion on March 27, 2019, and several times thereafter, the trial court said that it would consider the renewed motion to be a continuing objection to defendant having to represent himself and that the objection was overruled or the motion was denied.

On May 13, 2019, while the jury was deliberating, a discussion was held regarding the prior conviction allegations. Defendant chose to have a court trial regarding the prior strike conviction and prior serious felony conviction. After the jury returned its verdicts, the trial court scheduled the court trial for May 31. The court said that, after the prior conviction allegations were decided, the court would refer the matter to the Probation Department for a probation report. Defendant asked for an attorney. The trial court denied the motion but again said it would be an ongoing objection.

At the court trial on May 31, 2019, the trial court found the prior conviction allegations to be true. The court scheduled the sentencing hearing for August 16. Defendant reminded the trial court that he wanted to be represented by counsel. Defendant explained that he had been making motions for attorney representation "from day one before I started trial," but the motions had been denied. Defendant said he lacked knowledge of the law and did not "know what [he was] doing." Prior to the sentencing hearing, defendant filed a motion requesting the trial court strike defendant's

26

prior strike conviction (a *Romero*[6] motion).  At the sentencing hearing, the trial court denied defendant's *Romero* motion.

2.  *ANALYSIS*

Defendant contends the trial court erred by denying his motion for counsel to represent him at the trial on the prior conviction allegations and at the sentencing hearing.

"[A]ppellate courts have concluded that a motion for self-representation made after the jury returns its verdict on a primary offense but prior to commencement of a bifurcated trial on prior convictions is untimely and subject to the trial court's discretion because proceedings on the priors are merely part of the trial.  [Citations.]  In each of these [appellate] decisions, the courts concluded that the motions were actually made during trial, even though they were brought prior to the start of a second phase or stage of the trial."  (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1023.)

As to defendant's motion for counsel for the bench trial on the priors, our analysis *ante* applies because the bench trial was not a separate proceeding.  In other words, the analysis *ante* regarding defendant's motion for counsel for the trial encompasses the substantive charges and the prior conviction allegations.  Accordingly, we will not set forth a separate analysis concerning the bifurcated bench trial on the prior conviction allegations.

---

[6]  *People v. Romero* (1996) 13 Cal.4th 497.

By contrast, sentencing "is a proceeding separate and distinct from the trial." (*People v. Miller*, *supra*, 153 Cal.App.4th at pp. 1023-1024.) The concerns about delay that can accompany a motion for representation by counsel made during trial do "not apply to sentencing hearings, which are separate proceedings from the trial and occur after the trial has been completed. This is not to say that every request for [counsel] at sentencing will be timely. Much as a request [for counsel] at trial must be made a reasonable time before trial commences, the request for [counsel] at sentencing must be made within a reasonable time prior to commencement of the sentencing hearing." (*Id.* at p. 1024.) When an unequivocal motion for representation by counsel is made a reasonable time prior to sentencing, the motion must be granted—it is not a discretionary decision. (*Id.* at p. 1024.)

On May 14, 2019, after the jury returned its verdicts, the trial court set the bench trial for May 31 and explained that, on May 31, it would refer the matter to the Probation Department for a probation report. The trial court said it would not yet schedule the sentencing hearing. The following exchange then occurred:

"[Defendant]: That's for sentencing? [(presumably referring to the probation report)]

"The Court: Okay.

"[Defendant]: Can I ask for an attorney right now?

"The Court: You can and that—and that request is denied, but it is continued okay.

"[Defendant]: Thank you, your Honor."

28

Because defendant asked a question about sentencing immediately before asking for an attorney one can reasonably infer that defendant's May 14 motion for an attorney was meant to include the bench trial and the sentencing hearing. In regard to the sentencing hearing, defendant's motion was timely because the sentencing hearing had not been scheduled at that point and a probation report had not yet been requested. Defendant's motion was also unequivocal because he had been asking for counsel for two months. Because the motion was timely and unequivocal, the trial court was required to grant the motion. (*People v. Miller*, *supra*, 153 Cal.App.4th at p. 1024.) Therefore, the trial court erred by denying defendant's motion for counsel for the sentencing hearing. The error is reversible per se, which means defendant's sentence must be reversed. (*Ibid.*, citing *People v. Welch* (1999) 20 Cal.4th 701, 729 ["*Faretta*[7] error is reversible per se."].)

C.    <u>FIREARM ENHANCEMENT</u>

Defendant contends the two firearm enhancements (§ 12022.53, subd. (d)) must be stricken because the enhancement does not apply to attempted voluntary manslaughter. The People concede defendant is correct. Former section 12022.53, subdivisions (a) and (d), list all of the substantive offenses to which the firearm enhancement can be attached, and attempted voluntary manslaughter is not on the lists. Accordingly, we will reverse the two firearm enhancements (§ 12022.53, subd. (d)).

---

**7** *Faretta v. California* (1975) 422 U.S. 806.

D.    JAIL COSTS

Defendant contends the trial court erred by suspending an order for defendant to pay jail costs because such costs can only be imposed as a term of probation or a conditional sentence.  (§ 1203.1c, subd. (a).)  The People concede defendant is correct.  We have concluded *ante* that defendant's entire sentence must be reversed, which means this issue is moot in that we can provide defendant no further relief.  (*People v. Echavarria* (2017) 13 Cal.App.5th 1255, 1272.)  Accordingly, we will not address the merits of this issue.

## DISPOSITION

The section 12022.53, subdivisions (d) and (e), enhancements in Counts 1 and 2 are reversed.  The denial of defendant's motion for counsel for the sentencing hearing is reversed.  The sentence is reversed, which includes the ruling on the *Romero* motion.  The trial court is directed to grant defendant's motion for representation by counsel for the sentencing hearing and resentence defendant.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

RAMIREZ _____
P. J.

SLOUGH _____
J.

30